FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ AUG 0 2 2017 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

DONALD DEBROSSE,

                Plaintiff,

- against -

**MEMORANDUM DECISION AND ORDER**

13 Civ. 3822 (AMD) (CLP)

THE CITY OF NEW YORK, DETECTIVE MICHAEL GAYNOR, Tax #928363, DETECTIVE DAVID ARVELO, Tax #895970, DETECTIVE LORRAINE WINTERS, Tax #921297, POLICE OFFICER PABLO DEJESUS, Tax #915572, DETECTIVE ANDREW MENNELLA, Tax #922778, DETECTIVE ROBERT AIELLO, Tax #901092, DETECTIVE CLAUDE JEANPIERRE, Tax #91209, POLICE OFFICERS JOHN/JANE DOE(S) #S1–10,

                Defendants.

------------------------------------------------------------ X

**ANN DONNELLY, District Judge.**

The plaintiff, Donald Debrosse, brings this civil action for damages against seven detectives—Michael Gaynor, David Arvelo, Lorraine Winters, Pablo DeJesus, Andrew Mennella, Robert Aiello, and Claude Jean-Pierre. The plaintiff alleges that the defendants prosecuted him maliciously, abused the criminal process, and denied him a right to a fair trial, in violation of the Fourth, Fifth, and Fourteenth Amendments. The plaintiff also alleges municipal liability against the City of New York. The defendants move for summary judgment. For the reasons that follow, the defendants' motion is granted.

1

## BACKGROUND

On September 3, 2009, at approximately 8:20 p.m., Peter Daleus was shot in the head while sitting outside in the backyard of People's Delight Express Jerk Chicken in Brooklyn, New York.[1] (Defs.' 56.1 Statement ¶ 1; Pl.'s 56.1 Counterstatement ¶ 1.) Chryl Williams, a 16-year-old girl, was sitting next to Daleus at the time he was shot. (Defs.' 56.1 Statement ¶ 2; Pl.'s 56.1 Counterstatement ¶ 2; Williams Dep. at 18.) New York City Police Detectives Michael Gaynor and Lorraine Winters responded to the shooting. (Defs.' 56.1 Statement ¶ 4; Pl.'s 56.1 Counterstatement ¶ 4.) At approximately 10:00 p.m., Detective Winters interviewed Williams about what she saw. (Defs.' 56.1 Statement ¶ 7; Defs.' Ex. G at 12.) According to the defendants, Williams told Detective Winters that an unknown man approached Daleus and fired three shots at him. (Defs.' Ex. G at 12.) Police reports show that Williams described the shooter as a black, dark-skinned male, about five feet six inches tall, with a close haircut, wearing a black baseball hat with a green design on the front, and a dark tee-shirt. (*Id.*) Detective Winters recalled that Williams also said that the shooter had a "mean, mean face." (Winters Dep. at 17, 38.) Later that evening, at the precinct, Williams looked at photographs on a computer program called Photo Manager, but did not recognize anyone.[2] (*Id.* at 43, 86; Defs.' 56.1 Statement ¶ 8; Pl.'s 56.1 Counterstatement ¶ 8.)

Two days later, on September 5, 2009, Detective Gaynor learned from Detective Padro of the 67th Precinct that there had been a previous shooting at Daleus' home, but that there were no suspects in that shooting. (Defs.' 56.1 Statement ¶ 15.) Detective Gaynor was not able to interview Daleus until September 12, 2009, because of Daleus' injuries. (Defs.' 56.1 Statement ¶ 9; Pl.'s

---

[1] The facts are taken from the defendants' 56.1 Statement, the plaintiff's 56.1 Counterstatement, and my review of the entire record.
[2] Detective Winters testified that the plaintiff's photograph was not included in the photographs that she showed Williams. (Winters Dep. at 86-87.)

2

56.1 Counterstatement ¶ 9.) When he did interview him, Daleus said that he was a member of the Haitian Mafia Crips gang. (Defs.' 56.1 Statement ¶¶ 11-12.) Daleus did not see who shot him on September 3rd, but was involved in an ongoing dispute with someone named "Dutch," a fellow gang member.[3] (Defs.' 56.1 Statement ¶¶ 11-12.) According to Daleus, Dutch "shot up" Daleus' home to retaliate against him for stabbing his brother. (*Id.*) Daleus also said that he saw Dutch's friend, whom he knew as "Fruit Punch," staring at him from the yard behind the restaurant just before the shooting. (Defs.' 56.1 Statement ¶ 10.) Citing Daleus' deposition testimony from May 12, 2014—five years after the shooting—the plaintiff denies that Daleus mentioned him to Detective Gaynor, and claims that Daleus neither told Officer Gaynor that he had any problems with "Dutch" or mentioned the plaintiff or Fruit Punch to the police. (Pl.'s 56.1 Counterstatement ¶¶ 11-13; Defs.' Ex. E, Daleus Dep. at 40.)

On September 28, 2009, Detective Gaynor spoke to Officer Paul Blanc of the 70th Precinct Anti-Crime Unit, who was knowledgeable about Hattian gang members. Officer Blanc told Detective Gaynor that the plaintiff was the person known as "Dutch." (Defs.' 56.1 Statement ¶ 16.) On September 28, 2009, Detective Gaynor obtained the plaintiff's photograph and showed it to Officer Blanc, who confirmed that the plaintiff was Dutch. (Defs.' Ex. G at 53.) On that same date, Detective Gaynor showed the plaintiff's photograph to Daleus, who also confirmed that the plaintiff was Dutch. (*Id.*) Shortly thereafter, Detective Gaynor prepared a photographic array that included the plaintiff's photograph and showed the array to Williams at her apartment; Williams identified the plaintiff as the person she saw shoot Daleus.[4] (Defs.' 56.1 Statement ¶ 21.)

---

[3] Detective Gaynor also interviewed Daleus' brother, Michael, who confirmed the dispute between Daleus and Dutch, but did not want the detective to tell Daleus that they spoke. (Gaynor Dep. at 54-55.)
[4] The plaintiff claims that Williams denied identifying the plaintiff in the photo array. (Pl.'s 56.1 Counterstatement ¶ 20.) The portions of her testimony that the plaintiff cites do not support that claim.

3

Detective Gaynor made repeated attempts to locate the plaintiff; he visited the plaintiff's home, spoke with the plaintiff's father and sister, prepared an "ICard" for naming the plaintiff as a suspect, posted "wanted posters," conducted an "E Justice check," and contacted the plaintiff's attorney, Patrick Megaro, to arrange a time for the plaintiff to turn himself in. (Defs.' Ex. G at 55-68, Defs.' Ex. M at 16.) Although the detective and the lawyer agreed on a date for the plaintiff to surrender, the plaintiff did not appear at the precinct. The plaintiff was finally arrested five months after the shooting on February 8, 2010 at the Brooklyn Family Court, and transported to the 70th Precinct Detective Squad for questioning. (Defs.' 56.1 Statement ¶ 24; Pl.'s 56.1 Counterstatement ¶ 24.)

Detective Gaynor told the plaintiff that he would be placed in a line-up. The plaintiff responded that he wanted to speak to his lawyer, Mr. Megaro. (Defs.' Ex. M at 20-21.) The plaintiff called Mr. Megaro, who then spoke to the detective. (Defs.' 56.1 Statement ¶ 26; Pl.'s 56.1 Counterstatement ¶ 26.) When Detective Gaynor told Mr. Megaro that he was going to conduct a line-up, Mr. Megaro said that he wanted to be at the line-up, but that it would take him at least two hours to get to the precinct. (Defs.' 56.1 Statement ¶ 28; Pl.'s 56.1 Counterstatement ¶ 28.) Detective Gaynor said that he would not wait that long, to which Mr. Megaro replied, "you do what you have to do." (Defs.' Ex. M at 86.) Detective Gaynor went ahead with the line-up and Williams identified the plaintiff as the person who shot Daleus.[5] (Defs.' Ex. M at 72; Defs.' 56.1 Statement ¶¶ 29-30.)

The plaintiff was arrested and, on February 11, 2010, Williams and Detective Gaynor testified before the grand jury, which charged the plaintiff with attempted murder in the second degree, assault in first, second, and third degrees, attempted assault in the first and second degrees,

---

[5] The plaintiff's claim that Williams did not identify the plaintiff as the shooter, Pl.'s 56.1 Counterstatement ¶ 30, is not supported by the record. (Williams Dep. at 19, 27, 35, 39.)

4

and criminal possession of a weapon in the second and fourth degrees.[6] (Defs.' 56.1 Statement ¶ 33; Pl.'s 56.1 Counterstatement ¶ 33; Defs.' Ex. L at 3.)

Subsequently, the plaintiff moved to suppress Williams' photographic and line-up identifications. The Honorable Raymond Guzman of the Kings County Supreme Court held a *Wade* hearing at which Detective Gaynor described the photographic array and the line-up. Both he and Mr. Megaro testified about the circumstances leading up to the line-up. (Defs.' 56.1 Statement ¶ 36; Pl.'s 56.1 Counterstatement ¶ 36.) Justice Guzman credited the testimony of both witnesses, and "found no suggestiveness in either the photos or [] the conduct of the police prior to the witness viewing it . . . and absolutely found no suggestiveness in the procedures used by the police department to secure the line-up." (Defs.' Ex. N at 13, 18.) Nevertheless, Justice Guzman granted the motion to suppress the line-up because "as a matter of law, the police department did not give defense counsel under these circumstances a reasonable time to appear."[7] (*Id.* at 17.)

On February 7, 2012—two and a half years after the shooting—Justice Gustin Reichbach held an independent source hearing at which Chryl Williams testified, to determine there was an independent basis for Williams' identification of the plaintiff as the shooter. (Defs.' 56.1 Statement ¶ 40; Pl.'s 56.1 Counterstatement ¶ 40.) Williams remembered describing the shooter to the police on the night of the shooting, but, at the time of the hearing, could not give a detailed description of the shooter. (Defs.' Ex. P at 10-12.) Because Williams only gave a "generic

---

[6] The plaintiff moved to unseal the grand jury minutes. (ECF 34.) In a decision dated February 10, 2015, Judge Pollak, who reviewed the minutes *in camera*, denied the plaintiff's motion, ruling that the plaintiff did not show "particularized need." Judge Pollak observed that the testimony was "extremely short and utterly unremarkable." (ECF 42.)

[7] At the time of the hearing, New York law did not permit the introduction of photographic identifications, except in circumstances not pertinent here. *See People v. Caserta*, 19 N.Y.2d 18 (N.Y. 1966); *see also People v. Stanislous*, 967 N.Y.S.2d 911, 914 (N.Y. Sup. Ct. 2013).

description" at the hearing and was "unable to identify any distinctive features," Justice Reichbach ruled that there was no independent source for her identification. (*Id.* at 22.)

The rulings left prosecutors with no admissible evidence on the issue of identification. Accordingly, the prosecutor moved to dismiss the indictment on February 10, 2012, stating that "the People are left at this time with a case that we cannot prove beyond a reasonable doubt." (Defs.' 56.1 Statement ¶ 42.) Subsequently, the plaintiff brought this action for malicious prosecution, abuse of the criminal process, and denial of a right to a fair trial.

## DISCUSSION

Summary judgment is appropriate if the parties' submissions, taken together, show that there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a) & (c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A court considering a motion for summary judgment does not evaluate witness credibility, and must draw reasonable inferences and resolve all ambiguities in favor of the plaintiff. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); *see also Manganiello v. City of N.Y.*, 612 F.3d 149, 161 (2d Cir. 2010) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.").

However, the plaintiff may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). A "scintilla of evidence in support of the [non-movant's] position" is insufficient. *Hayut v. State Univ. of New York*, 352 F.3d 733, 743 (2d Cir. 2003) (citation omitted). While a plaintiff is entitled "to the assumption that a jury would believe his testimony," a plaintiff

6

is only entitled to the *reasonable inferences* that can be drawn from this testimony. *Richardson v. City of N.Y.*, No. 02-cv-3651, 2006 WL 2792768, at *3 (E.D.N.Y. Sept. 27, 2006). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," the court must deny the motion for summary judgment. *Anderson*, 477 U.S. at 248.

The plaintiff concedes that he cannot not sustain the malicious abuse of process claim or the *Monell* claims of municipal liability against the City of New York. The plaintiff also concedes that he had no good faith basis to oppose summary judgment on the claims against Detectives Arvelo, DeJesus, Mennella, Aiello, and Jean-Pierre. Accordingly, I grant the defendants' motion for summary judgment on these claims and consider only the remaining claims against Detective Gaynor and Detective Winters.[8] *See Darboe v. Staples, Inc.*, 243 F. Supp. 2d 5, 10 (S.D.N.Y. 2003) (granting defendants' motion for summary judgment where the plaintiff states in briefing that he cannot maintain his burden).

### 1. Malicious Prosecution

To state a claim for malicious prosecution under Section 1983, the plaintiff must show "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendants' actions." *Hicks v. City of New York*, No. 15-CV-04888, 2017 WL 532304, at *6 (S.D.N.Y. Feb. 8, 2017) (citing *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)).

---

[8] The defendants argue that the plaintiff has not alleged that Detective Winters was personally involved in the alleged constitutional deprivations as required to state a claim under Section 1983. *See Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010). The plaintiff's claim that Detective Winters "begged" Daleus to identify the plaintiff as the shooter, if true, sufficiently alleges personal involvement to state a claim under Section 1983.

### a. Probable Cause

"[T]he existence of probable cause constitutes a complete defense to a claim of malicious prosecution in New York." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). Generally, a grand jury indictment "creates a presumption of probable cause that can only be overcome by evidence that the indictment was the product of fraud, perjury, the suppression of evidence by the police, or other police conduct undertaken in bad faith." *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (internal quotation marks omitted). Bad faith may be shown "through evidence that police witnesses have not made a complete and full statement of facts" or through evidence that the prosecutor "misrepresented, falsified or suppressed evidence." *Hicks*, 2017 WL 532304, at *7; *Brown v. City of N.Y.*, 306 F. Supp. 2d 473, 479-80 (S.D.N.Y. 2004). However, "mere conjecture and surmise" are insufficient to rebut the presumption afforded by a grand jury's indictment. *Savino*, 331 F.3d at 73. "The burden of rebutting the presumption of probable cause requires the plaintiff to establish what occurred in the grand jury, and to further establish that those circumstances warrant a finding of misconduct sufficient to erode the premise that the Grand Jury acts judicially." *Rothstein v. Carriere*, 373 F.3d 275, 284 (2d Cir. 2004).

Here, a grand jury indicted the plaintiff after hearing from two witnesses: Detective Gaynor and the eye witness, Chryl Williams. The defendants argue that the indictment is presumptive evidence of probable cause, which is a complete defense to the plaintiff's malicious prosecution claim. The plaintiff's efforts to rebut that presumption are not persuasive.

For example, the plaintiff relies on *Cox v. County of Suffolk*, 827 F. Supp. 935, 937 (E.D.N.Y. 1993) for the proposition that the presumption of probable cause does not apply when a court dismisses the case for lack of evidence. *Cox* is a different case. Unlike *Cox*, the hearing

court in this case did not dismiss the indictment for legal insufficiency;[9] rather, the government dismissed the case after adverse rulings having nothing to do with the sufficiency of the evidence before the grand jury. The plaintiff has not cited nor is the Court aware of any authority holding that the presumption of probable cause does not apply when *the government* dismisses a criminal case. *See Felmine v. City of New York*, No. 09-CV-3768, 2011 WL 4543268, at *12 (E.D.N.Y. Sept. 29, 2011) ("[T]he dismissal of the case against [the plaintiff] did not pertain to the evidence adduced at the grand jury, but rather resulted from the ADA's voluntary motion to dismiss due the difficulty of ascertaining trial testimony from the victim."); *Hadid v. City of New York*, 182 F. Supp. 3d 4, 14 (E.D.N.Y. 2016) ("[T]he evidence was legally insufficient to establish Hadid's guilt of the crime of perjury in the first degree . . . Such a dismissal does not rebut the 'general rule . . . that a Grand Jury Indictment is prima facie evidence of probable cause' under New York state law.").

Equally unpersuasive is the plaintiff's argument that Detective Gaynor and Detective Winters acted in bad faith during the course of the investigation. According to the plaintiff, Detective Gaynor "coerced" Chyrl Williams to identify the plaintiff, even though she did not see the shooter. The plaintiff quotes isolated snippets of Williams' deposition testimony to support his theory that she neither saw the shooter nor identified the plaintiff as the shooter. In fact, the thrust of Williams' deposition was that she either did not remember what she saw or what she told detectives five years earlier, or was trying to forget it.[10] (Williams Dep. at 23, 38, 41, 63.) Williams' failure of memory at her 2014 deposition, however, does not mean that the defendants lacked probable cause to arrest and prosecute the plaintiff in 2009.

---

[9] In New York, courts review indictments for legal sufficiency as a matter of routine.
[10] For example, Williams stated that the shooting was "something that [she did] not want to relive," that she "never kept up with any of it because it's not something that [she] want[ed] to be a part of . . . or ever tried to remember," and that she "always tried [to] block [it] out of [her] memory." (Williams Dep. at 10, 31, 46.)

9

More significant, Williams was clear that the detectives neither pressured her to identify the plaintiff or suggested that he was the shooter. On the contrary, she specified that the detectives "followed procedure" (Williams Dep. at 40), that they never told her whom to identify (*id.* at 36-37), and that they did not pressure her. (*Id.* at 55.) Even viewing the facts in the light most favorable to the plaintiff, as I am required to do on summary judgment, the plaintiff's selective reading of Williams' deposition testimony does not support his claim that Detective Gaynor coerced Williams to identify the plaintiff.[11]

The plaintiff also argues that the detectives "fabricated" Peter Daleus' statements to them after the shooting. Daleus testified at his deposition that he never told the detectives that he suspected that the plaintiff "shot at" his home or that he saw "Fruit Punch" at the restaurant on the night of the shooting. Even accepting Daleus' deposition testimony at face value, it has no effect on the indictment. Daleus did not testify before the grand jury, and there is no evidence that Detective Gaynor testified about Daleus' statements before the grand jury, much less that the grand jury relied on anything Daleus said. *See e.g. Hicks*, 2017 WL 532304, at *8 (holding that "fabricated evidence" does not vitiate probable cause when a prosecutor is able to gain sufficient probable cause through other evidence.) Or course, even if Detective Gaynor had relayed the contents of his interview with Daleus to the grand jury, it does not necessarily follow that he was acting in bad faith. *See e.g., Alvarado v. City of New York*, No. 04-CV-2558, 2009 WL 510813, at *2 (E.D.N.Y. Feb. 27, 2009) ("even if the grand jury minutes showed that the 'testimonies of the police witnesses and Complainant differ[ed] from the contents of the Complaint report and their deposition testimonies' . . . this would not provide the type of evidence necessary for plaintiff

---

[11] Peter Daleus claimed that Williams reported to him that the police told her that the plaintiff was the suspect. (Daleus Dep. at 57.) Williams denied telling Daleus any such thing. (Williams Dep. at 35-36.) In any event, his testimony about her statements is hearsay, and not admissible for its truth.

10

rebut the presumption of probable cause in this case."); *Watson v. Grady*, No. 09-CV-3055, 2015 WL 2168189, at *16 (S.D.N.Y. May 7, 2015), *aff'd sub nom. Watson v. Sims*, 648 F. App'x 49 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 626, 196 L. Ed. 2d 516 (2017) (holding that inconsistencies between a witnesses' deposition testimony and what the officer allegedly reported the witness said during the investigation did not establish bad faith).[12]

Finally, the plaintiff argues that the presumption of probable cause was rebutted by the hearing court's determination, more than a year and a half after the indictment, to suppress the line-up identification, followed by a second court's determination that there was no independent source for Williams' line-up identification. However, the "later suppression of certain witnesses' out-of-court identifications is irrelevant to a determination of whether probable cause supported the arrest warrant and the indictment." *Woodyard v. County of Essex*, No. 12-2945, 2013 WL 791634, at *5 (3d Cir. March 5, 2013); *see also Miller v. Carney*, No. 12-cv-0972, 2014 WL 4677054, at *10 (N.D.N.Y. Aug. 7, 2014) ("The fact that the Plaintiff's statements to police and the drugs found on his person were later suppressed as the fruit of an unconstitutional entry does not undermine our conclusion that Defendant Prior had probable cause to charge Plaintiff.").

In *Restivo v. Hessemann*, 846 F.3d 547, 571 (2d Cir. 2017), the trial court held that a co-conspirator's confession was inadmissible at the plaintiff's criminal trial. After the government voluntarily dismissed the case, the plaintiff brought a claim of malicious prosecution, arguing that the government lacked probable cause to prosecute because the key evidence—the confession—was found to be inadmissible. *Id.* The Second Circuit held that if a piece of evidence "looked at

---

[12] The plaintiff also argues that Detective Gaynor acted in bad faith because he did not specify on a DD5 that the plaintiff was represented by counsel. This omission "has no bearing whatever in and of itself on want of probable cause," and therefore, does not factor into the bad faith analysis. *Bradley v. Nolan*, No. 03-cv-1616, 2007 WL 959160, at *3 (S.D.N.Y. Mar. 30, 2007) (citing *Warren v. Byrne*, 699 F.2d 95, 98 (2d Cir.1983)).

*ex ante*" supports a probable cause determination, "even if ultimately deemed inadmissible," it is a defense to a claim of malicious prosecution. *Id.* The same is true in this case. Williams identified the plaintiff both in the photographic array and at the line-up, which gave Detective Gaynor probable cause to initiate the prosecution. The fact that the identification was later suppressed—for reasons having nothing to do with the reliability of the identification—does not undermine the initial determination of probable cause. Accordingly, I find that the defendants had probable cause to prosecute the plaintiff, which is a complete defense to the plaintiff's claim of malicious prosecution.

### b. Favorable Termination and Actual Malice

Because there was probable cause to arrest and prosecute the plaintiff, it is not necessary to address the issues of favorable termination and actual malice. Nonetheless, I address both issues and conclude that the plaintiff cannot satisfy the favorable termination and actual malice elements of his malicious prosecution claim. Under New York law, "a criminal proceeding is terminated favorably to the accused when there can be no further proceeding upon the complaint or indictment, and no further prosecution of the alleged offense." *Harris v. City of New York*, No. 15-CV-06467, 2017 WL 59081, at *3 (E.D.N.Y. Jan. 4, 2017) (internal citations omitted). "[E]ven where a termination is final, it will only be a favorable termination if the termination 'is not inconsistent with innocence.'" *Id.* (citing *Rothstein v. Carriere*, 373 F.3d 275, 286 (2d Cir. 2004)). The determination of whether a termination is "not inconsistent with innocence" depends on the "circumstances of each case." *Id.*

Where a dismissal is premised on the suppression of evidence, it is not a favorable termination because it "does not establish or imply [the plaintiff's] innocence," since the dismissal "was not related to or based upon the reliability or unreliability of the evidence." *Miller v. Cuccia*,

201 F. 3d 431 (2d Cir. 1999); *Harris*, 2017 WL 59081, at * 4 ("[A] dismissal of a conviction or a dismissal of a case because evidence is suppressed, particularly when the evidence was suppressed on appeal, is not a favorable termination."). Here, the prosecution moved to dismiss the charges against the plaintiff because it could not meet its burden of proof after the pre-trial rulings suppressing Williams' line-up identification and finding no independent source. In suppressing the line-up, Judge Guzman specifically held that he suppressed Williams' line-up identification not because there was anything suggestive about the line-up, but because Detective Gaynor did not give the plaintiff's lawyer a reasonable opportunity to appear. Thus, the dismissal does not satisfy the favorable termination element.

As to actual malice element, the plaintiff makes the same arguments that he makes in connection with his bad faith claim. These arguments are no more persuasive in the actual malice context than they were in the fad faith context. For the reasons explained above, I reject the plaintiff's claim that the defendants were motivated by actual malice. Because the plaintiff cannot establish the necessary elements, the defendants' motion for summary judgment on the malicious prosecution claim is granted.

### 2. Right to a Fair Trial

A person's right to a fair trial is violated if an investigating official fabricates evidence that is likely to influence a jury's decision, forwards that information to prosecutors, and the plaintiff suffers a deprivation of liberty as a result. *See Garnett v. Undercover Officer C0039*, 13-CV-7083, 2015 WL 1539044, at *4 (S.D.N.Y. Apr. 6, 2015), *aff'd*, 838 F.3d 265 (2d Cir. 2016) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)). As with the malicious prosecution claim, the plaintiff argues that the defendants fabricated evidence by telling

prosecutors that: (1) Williams identified the plaintiff as the shooter, (2) Daleus said that the plaintiff "shot up" his home, and (3) Daleus saw "Fruit Punch" at on the night of the shooting.

The defendants' first response is that the plaintiff's right to a fair trial could not be violated for the simple reasons that there was no trial. This argument appeals to common sense. Indeed, several courts in this district have adopted it. *See e.g. Hope v. City of New York*, No. CV-08-5022, 2010 WL 331678, at *4 (E.D.N.Y. Jan. 22, 2010) ("Plaintiff's claim that he was denied a right to a 'fair trial' is similarly without merit. There was no trial."); *Derosa v. City of New York*, 12-CV-3114, 2014 WL 3908111, at *2 (E.D.N.Y. Aug. 11, 2014) ("Since there was no trial, [] Section 1983 claims for denial of the right to a fair trial cannot succeed if there was no trial.") The only apparent Second Circuit authority—*Ricciuti v. New York City Transit Authority*, 124 F.3d 123, 130 (2d Cir.1997)—seems to hold otherwise. There, the Second Circuit permitted Ricciuti's Section 1983 fair trial claim to proceed, even though the charges against him were dismissed before trial; the Second Circuit held that when a police officer "creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial." *Id.* Even though *Ricciuti* "appears to be the only [Second Circuit] case permitting such a claim to proceed even where a trial did not take place, it is binding precedent." *Douglas v. City of New York*, 595 F. Supp. 2d 333, 347 (S.D.N.Y. 2009).

Under either view, however, the plaintiff has not cited any evidence that the defendants fabricated evidence. Rather, as discussed above, the plaintiff makes only conclusory and unsupported allegations that the defendants lied about Williams' identification and about what Daleus told them, and his allegations are not supported by the record. *See e.g. Culpepper v. City of New York*, No. 14-CV-6585, 2016 WL 5334978, at *6 (S.D.N.Y. Sept. 21, 2016) (summary judgment is appropriate where the "plaintiff's allegations are conclusory and devoid of detail and

he provides no evidentiary support for them."). A review of Williams' deposition testimony shows that at most, five years after the shooting, she did not remember the details of the shooting or her interactions with the detectives. While Daleus made certain claims—that the detectives urged him to identify the plaintiff—he also claimed that he did not accede to their suggestions, and did not identify the plaintiff.[13] Thus, the plaintiff has cited no evidence that the defendants falsified testimony or coerced witnesses at the time of the shooting or during its investigation. *See Alvarado*, 2009 WL 510813, at *2 (holding that various "discrepancies" between the identification evidence provided to the police and subsequent sworn was "irrelevant to the question of whether there was fraud, perjury, suppression of evidence, or other bad faith.") Accordingly, the defendants' motion for summary judgment on the fair trial claim is granted.

### 3. Qualified Immunity

The doctrine of qualified immunity "shields government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Duamutef v. Hollins*, 297 F.3d 108, 111 (2d Cir. 2002). Because I find that the defendants did not prosecute the plaintiff maliciously or violate his right to a fair trial, I also find that the defendants have not violated any clearly established constitutional rights. Therefore, the defendants are protected by qualified immunity.

---

[13] In addition, Daleus testified at his deposition that due to complications from the shooting, including a stroke, "there might be certain things he cannot remember." (Daleus Dep. at 6.)

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted. The Clerk of the Court is respectfully directed to close this case.

**SO ORDERED.**

                                                   s/ AMD
                                           Ann M. Donnelly
                                           United States District Judge

Dated: Brooklyn, New York
       August 2, 2017